CITY OF HAMMOND, Appellant–Defendant,

v.

Joseph CIPICH, an incapacitated adult by Suzanne SKOWRONEK, Appellee–Plaintiff.

No. 45A03–0204–CV–116.

Court of Appeals of Indiana.

May 30, 2003.

**1274**

David W. Weigle, David W. Weigle & Associates, Hammond, IN, Attorney for Appellant.

Terrance L. Smith, David S. Gladish, Smith & DeBonis, LLC, Highland, IN, Attorneys for Appellee.

## OPINION

BAILEY, Judge.

### Case Summary

The City of Hammond, Indiana (Hammond), defendant below, appeals the trial court's grant of the motion to correct error filed on behalf of Joseph Cipich (Cipich), plaintiff below, following a jury verdict in favor of Hammond. Hammond also appeals the trial court's earlier denial of its motions for summary judgment and for judgment on the evidence. We reverse.

### Issues

Hammond identifies seven issues, which we consolidate and restate as (1) whether the trial court appropriately denied Hammond's motions for summary judgment and for judgment on the evidence; and (2) whether the trial court erred by granting Cipich's motion to correct error. Because of our resolution of the first issue, we do not reach the second.

### Facts and Procedural History

At approximately 4:00 p.m. on March 17, 1996, twenty-four year-old Cipich drove his 1991 Ford Mustang to the Hammond Marina. He passed through the Marina's security gate without stopping as instructed by guards, and drove over a curb, across some rocks, and into the waters of Lake Michigan. The temperature of the water was an icy thirty-four degrees Fahrenheit. Guards from the security gate went to the edge of the water where they saw Cipich's car floating away. The guards implored Cipich to escape. Cipich yelled "f___ you" several times through the open driver's side window as the vehicle began to sink. (Tr. 412, 982.) The security guards called the Hammond Fire Department, which dispatched emergency medical technicians (EMTs) and firefighters.

An ambulance with EMTs arrived at approximately 4:07 p.m. The EMTs saw that Cipich's vehicle was completely submerged, with the car's roof less than one foot below the surface. At 4:08 p.m., a fire truck arrived. Firefighter Jeffrey Smith took a firefighting appliance known as a pike pole and stepped out onto a floating object to get closer to the vehicle. At some point, Smith used the long pole to

break the glass covering the car's rear hatchback with the hope that Cipich would escape through the opening. Although some amount of air escaped from the vehicle, Cipich remained inside. Smith then placed the end of the pike pole into the vehicle hoping that Cipich might be able to grab the hook on the end of the pole and be pulled out.

In the meantime, people had gathered around the water's edge. Two bystanders offered to jump in the water to help Cipich, but were instructed by either security guards, police officers or firefighters to stay out of the frigid water.

At 4:13 or 4:14 p.m., a fire department vehicle arrived towing a rescue boat that contained cold-water flotation and insulation gear known as "gumby suits." Around the same time, Assistant Chief James Gasaway, who was still at the station, issued an order over the radio that was recorded in the fire department log as "unless there is someone to hook that veh [sic] from underneath—do not let anyone in the water." (App. Tab 16.) Chief Gasaway understood his order to mean that no one should go in the water without appropriate cold water gear. Firefighter Steven Brozovich retrieved a gumby suit from the rescue boat, and at some point put the suit on. At approximately 4:23 p.m., Chief Gasaway arrived at the scene. Around this time, Brozovich entered the water and made his way to the vehicle. As Brozovich reached Cipich, Firefighter Smith grappled Cipich's arm with the hook on the end of the pike pole, and the two pulled Cipich out of the submerged car. It was approximately 4:31, and Cipich was not breathing and had no pulse. Cipich was resuscitated and taken to a local hospital, but as a result of prolonged oxygen deprivation, he sustained serious brain damage and will remain in a vegetative state for the remainder of his life.

Cipich's amended complaint was filed on February 27, 1998,[1] containing allegations that Hammond was liable both under 42 U.S.C. § 1983 for the violation of his federal constitutional rights, and under state negligence law. Hammond filed a motion for summary judgment on September 28, 2001 claiming, among other things, that it had no constitutional obligation to rescue Cipich and could not be liable under § 1983 for damages arising out of the rescue, and that it was entitled to common law governmental immunity from Cipich's negligence claims. The trial court held a hearing on the motion on November 13, 2001, and denied it on November 30, 2001. A jury trial began on November 26, 2001. Hammond moved for judgment on the evidence at the close of Cipich's case and renewed the motion at the conclusion of all the evidence, repeating the arguments made in conjunction with its summary judgment motion. The trial court denied the motion both times. The jury returned a verdict in favor of Hammond on December 4, 2001. On December 28, 2001, Cipich filed a motion to correct error seeking a new trial, contending that the trial court erred by admitting evidence of Cipich's alleged drug use and evidence of money found on Cipich during the rescue, and that the jury's verdict was tainted by the introduction of perjured testimony by a witness for Hammond. The trial court granted the motion and ordered a new trial on February 21, 2002. Hammond appeals.

### Discussion and Decision

### A. Standard of Review

Hammond argues that the trial court erred by denying its motion for summary

---

1. Cipich's complaint was filed on his behalf by his mother and legally-appointed guardian, Suzanne Skowronek.

judgment and its motions for judgment on the evidence, all of which addressed the legal and factual sufficiency of Cipich's constitutional and negligence claims.

### (1) Summary Judgment

Pursuant to Rule 56(C) of the Indiana Rules of Trial Procedure, summary judgment is appropriate when there are no genuine issues of material fact and when the moving party is entitled to judgment as a matter of law. When reviewing a decision to grant summary judgment, this court applies the same standard as the trial court. *Best Homes, Inc. v. Rainwater*, 714 N.E.2d 702, 705 (Ind.Ct.App.1999). We must determine whether there is a genuine issue of material fact requiring trial, and whether the moving party is entitled to judgment as a matter of law. *Id.* Neither the trial court nor the reviewing court may look beyond the evidence specifically designated to the trial court. *Id.* A party seeking summary judgment bears the burden to make a prima facie showing that there are no genuine issues of material fact and that the party is entitled to judgment as a matter of law. *American Mgmt., Inc. v. MIF Realty, L.P.*, 666 N.E.2d 424, 428 (Ind.Ct.App. 1996). Once the moving party satisfies this burden through evidence designated to the trial court pursuant to Trial Rule 56, the non-moving party may not rest on its pleadings, but must designate specific facts demonstrating the existence of a genuine issue for trial. *Id.* A defendant in a negligence action may obtain summary judgment by demonstrating that the undisputed material facts negate at least one element of the plaintiff's claim or that the claim is barred by an affirmative defense. *Jacques v. Allied Bldg. Servs. of Ind., Inc.*, 717 N.E.2d 606, 608 (Ind.Ct.App.1999).

Here, while Hammond has provided us with its motion for summary judgment and its memorandum in support of that motion, it has not provided us with any of the evidence, consisting primarily of portions of deposition testimony, designated to the trial court. Because our inquiry is confined to the evidence designated to the trial court, we have nothing to review, and the issue is waived.

### (2) Judgment on the Evidence

The purpose of a motion for judgment on the evidence is to test the sufficiency of the evidence. *Faulk v. Northwest Radiologists, P.C.*, 751 N.E.2d 233, 238 (Ind.Ct.App.2001), *trans. denied.* The grant or denial of a motion for judgment on the evidence is within the broad discretion of the trial court and will be reversed only for an abuse of that discretion. *Id.* Motions for judgment on the evidence are governed by Indiana Trial Rule 50, which provides, in relevant part:

> Where all or some of the issues in a case tried before a jury or an advisory jury are not supported by sufficient evidence or a verdict thereon is clearly erroneous as contrary to the evidence because the evidence is insufficient to support it, the court shall withdraw such issues from the jury and enter judgment thereon or shall enter judgment thereon notwithstanding a verdict.

When we review a trial court's ruling on a motion for judgment on the evidence, this court is bound by the same standard as the trial court. *Faulk*, 751 N.E.2d at 238. We may not substitute our judgment for that of the jury on questions of fact, nor should a motion for judgment on the evidence be granted because the evidence favors the moving party. *Id.* Rather, we determine only whether there exists any reasonable evidence supporting the claim, and if so, whether the inference supporting the claim can be drawn without undue speculation. *Id.* We consider the evidence in the light most favorable to the nonmoving parties. *Id.*

As noted above, Hammond has waived its argument that the trial court erred by failing to enter summary judgment in Hammond's favor. However, where there is no real dispute in the evidence bearing on an issue, the court may determine the matter as a question of law in conjunction with a motion for judgment on the evidence. *See St. Mary's Byzantine Church v. Mantich*, 505 N.E.2d 811, 814 (Ind.Ct. App.1987). We review all questions of law, including the trial court's legal conclusions, under a de novo standard. *Pedraza v. Grande*, 712 N.E.2d 1007, 1010 (Ind.Ct. App.1999).

### B. Discussion

### 1. Constitutional Claims

■ In his complaint, Cipich alleged that Hammond deprived him of his life, liberty and property without due process of law, in violation of the Fourteenth Amendment. *See* U.S. CONST. Amend. XIV ("No state shall ... deprive any person of life, liberty, or property, without due process of law."). Cipich claimed that Hammond was liable for this violation under 42 U.S.C. § 1983, which provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

Thus, liability under § 1983 requires proof that a person acting under color of law subjects someone to a violation of that person's constitutional rights. *See Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). The obvious starting point for a § 1983 analysis is to identify the specific constitutional right that was allegedly violated. *See Gossmeyer v. McDonald*, 128 F.3d 481, 490 (7th Cir.1997).

In this case, Cipich alleged that his serious and debilitating injuries deprived him of his Fourteenth Amendment right to liberty. The kinds of injuries Cipich sustained clearly implicate the liberty interests protected by the due process clause. *See DeShaney v. Winnebago County Dep't of Soc. Servs.*, 812 F.2d 298, 301 (7th Cir. 1987), *affirmed*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). The question, however, is whether Hammond could be responsible for those injuries.

■ The Due Process clause of the Fourteenth Amendment does not require governmental units to provide for or to protect the life, liberty or property of citizens; it only prohibits the government from taking away those rights. *DeShaney*, 489 U.S. at 195, 109 S.Ct. 998. Thus, states and their political subdivisions have no due process obligation to provide emergency rescue services for their citizens, and neither the failure to rescue a person from danger nor the negligent rescue of a person will support liability under § 1983. *See Culver–Union Twp. Ambulance Svc. v. Steindler*, 629 N.E.2d 1231, 1235 (Ind. 1994).

■ Hammond argues that it was entitled to judgment on the evidence because it had no duty to save Cipich, and could not under any circumstances be liable for his injuries as a result of its rescue efforts. Government entities may, however, have a due process obligation to provide services to individuals for their care and protection under certain limited circumstances. Specifically, when the government takes a person and holds him against his will, the government's action

creates a special relationship between the government and the person, and the Constitution accordingly imposes upon the government some duty to assume responsibility for the person's safety and well-being. *DeShaney*, 489 U.S. at 200, 109 S.Ct. 998. As the United States Supreme Court has explained, pursuant to this so-called "special relationship" exception,

> it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the "deprivation of liberty" triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means.

*Id.* (footnote omitted). The Seventh Circuit Court of Appeals applied these principles to allegations of constitutional torts committed during a botched underwater rescue operation in *Ross v. United States*, 910 F.2d 1422 (7th Cir.1990).

In *Ross*, a municipality had a policy forbidding aquatic rescue attempts by unauthorized personnel. This policy, enforced by a sheriff's deputy, prevented bystanders from attempting to rescue a child who subsequently drowned. The trial court dismissed claims brought by the victim's estate claiming that the municipality violated the victim's constitutional rights. The Seventh Circuit Court of Appeals noted that under pre-*DeShaney* authority, a

constitutional violation may occur when the state " 'greatly increase[s] the risk while constricting access to self-help,' " and that " '[w]hen a state cuts off sources of private aid, it must provide replacement protection.' " 910 F.2d at 1431 (quoting *Archie v. City of Racine*, 847 F.2d 1211, 1223 (7th Cir.1988)). The Seventh Circuit reinstated the claims, reasoning that the policy in question amounted to the municipality's direct imposition of control over the victim's fate that put the victim in greater danger than he otherwise would have been in had the municipality done nothing. *Id.* at 1431.[2]

■ Cipich argues that his claim was cognizable under § 1983 pursuant to *Ross*. In particular, Cipich contends that Hammond restricted his liberty by taking control of the scene of his accident during the rescue efforts, and thus undertook the responsibility to avoid making his situation worse. According to Cipich, Hammond restricted his liberty and cut off sources of self-help when an unidentified firefighter told two bystanders not to jump in the water to attempt a rescue. Cipich further claims that Hammond made his situation worse by excluding the bystanders and by conducting an uncoordinated rescue effort that suffered from poor training procedures.

■ This case is unlike *Ross* in a decisive way. Specifically, there was no pre-existing government policy mandating

---

**2.** Although the Seventh Circuit Court of Appeals cited pre-*DeShaney* doctrine in support of its conclusion that the municipality owed a duty to the drowning victim, the court later explained that *Ross* amounted to an application of the "special relationship" exception to the *DeShaney* rule. *See Kitzman–Kelley v. Warner*, 203 F.3d 454, 458 (7th Cir.2000). In *Kitzman–Kelley*, the court noted that "this exception must be grounded in a prior restriction of the individual's liberty that places that person in a danger that would not have been

encountered, at least to the same order of magnitude, in the absence of the state's action." In other words, when a government entity does something to restrict a person's liberty, such as by limiting access to self-help and cutting off sources of private aid to a person in need of rescue, the government is obligated to replace whatever aid was excluded and should refrain from making the person's situation worse than it would have been in the absence of the government's restriction of the person's liberty.

the exclusion of private or unofficial rescuers from water rescue situations in this case. While a municipality may be liable under § 1983 for deprivations of federal rights, a municipality may not be vicariously liable under § 1983 for the acts of its employees under the doctrine of respondeat superior. *See Pembaur v. Cincinnati,* 475 U.S. 469, 478, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). Rather, a municipality may be liable only if the deprivation is caused by acts that are, properly speaking, acts of the municipality itself. *Id.* at 479–80, 106 S.Ct. 1292. This means that to be the basis for municipal liability under § 1983, tortious conduct generally must be pursuant to a municipality's "official policy" made either by the municipality itself or by someone responsible for establishing policy. *Id.* at 478–83, 106 S.Ct. 1292.

 Cipich appears to argue that Hammond's official policy excluding the would-be rescuers was made and implemented "on the ground." It is true that when an official responsible for establishing final government policy with respect to an activity in question adopts a particular course of action in a particular case, the municipality may be liable for any resulting constitutional deprivations. *Pembaur,* 475 U.S. at 480–83, 106 S.Ct. 1292. In this case, however, there was no evidence whatsoever that the unidentified firefighter[3] who told the unidentified bystanders to stay out of the water was in any way responsible for establishing final government policy with respect to the exclusion of outside rescuers from such situations. Thus, there was no evidence supporting Cipich's claim that Hammond itself restricted Cipich's liberty by excluding private rescuers, and therefore no basis upon which to conclude that Hammond owed Cipich a constitutional duty under the special relationship exception to the *DeShaney* rule.[4] Hammond was

3. The evidence was disputed as to whether the person was one of Hammond's firefighters at all. We will assume for purposes of our discussion that it was one of Hammond's personnel.

4. Even if the municipality of Hammond itself had restricted Cipich's liberty through an official policy such that Hammond was obligated by virtue of the resulting special relationship to avoid increasing Cipich's risk of harm, Cipich's allegations that Hammond made his situation worse by excluding the two would-be rescuers or by conducting an uncoordinated rescue effort that suffered from poor training procedures miss the point. The harm Cipich faced, and the harm that caused his injuries, was created entirely by Cipich's own actions. There was no evidence that Hammond made Cipich's situation worse than it otherwise was.

In particular, there was no evidence at all indicating that the two civilian bystanders would have done any better than Hammond's firefighters at rescuing Cipich. In *Ross,* the excluded rescuers consisted of two lifeguards, two firefighters, a police officer, and two civilian scuba divers with a boat and scuba equipment. Here, there was nothing to suggest that the would-be rescuers possessed anything more than courage and enthusiasm, and without more, it would be pure speculation to suppose that they could have had any success in pulling Cipich out of the vehicle, particularly in view of the frigid temperature of the water. The dearth of evidence suggesting that the civilian bystanders could have offered any meaningful help also means that there was no basis to conclude that Hammond failed to adequately replace the help it excluded by using its own firefighters to effect Cipich's rescue rather than the two bystanders.

Moreover, while Cipich claims that Hammond's rescue efforts were flawed and negligent, these efforts did not make Cipich's situation worse, as the only alternative to rescue was remaining in the submerged vehicle. At most, Hammond's efforts failed to improve the precarious situation Cipich created. Cipich understandably complains that Hammond personnel waited too long before entering the water, but again, Hammond had no constitutional obligation to do anything under *DeShaney.*

accordingly entitled to judgment on the evidence on Cipich's constitutional claims.[5]

### 2. Negligence Claims

■ Hammond also contends that it was entitled to judgment on the evidence on Cipich's negligence claims on the ground that it was immune from liability under the common law. In *Benton v. City of Oakland City*, the Indiana Supreme Court reaffirmed the long-standing rule that

> all governmental units [are] bound, both directly and under a theory of respondeat superior, by the common law duty to use ordinary and reasonable care under the circumstances, except for such claims as failure to prevent crime, appointment of an incompetent official, or an incorrect judicial decision.

721 N.E.2d 224, 230 (Ind.1999) (footnote omitted). According to the court, this rule

> is properly applied by presuming that a governmental unit is bound by the same duty of care as a non-governmental unit

except where the duty alleged to have been breached is so closely akin to one of the limited exceptions (prevent crime, appoint competent officials, or make correct judicial decisions) that it should be treated as one as well.

*Id.*

This Court had the opportunity to apply *Benton* in *Gates v. Town of Chandler Water Dep't*, (725 N.E.2d 117 Ind. Ct.App. 2000). In *Gates*, the plaintiffs had sued the Town of Chandler Water department claiming that they were damaged by the department's negligent failure to maintain an adequate water supply and sufficient water pressure necessary to combat a fire that broke out at their residence. The water department claimed governmental immunity. We recognized that under *Benton*, our inquiry was whether the duty to maintain an adequate water supply for fire protection is "so closely akin to one of the limited exceptions (prevent crime, appoint competent officials, or make correct judicial decisions) ... that it should also be

---

5. Cipich also identifies Hammond's alleged "failure to train" its personnel as a constitutional injury cognizable under § 1983. While a § 1983 action may be predicated on the failure to adequately train a government agent alleged to have committed a constitutional violation, *see Kitzman–Kelley v. Warner*, 203 F.3d 454, 459 (7th Cir.2000), the failure to train is not itself a violation of the constitution. Rather, allegations of inadequate training are simply a way for plaintiffs to link an actual decision by an upper-level policy-making municipal official to a challenged incident. *See Walker v. City of New York*, 974 F.2d 293, 297 (2nd Cir.1992). In this case, Cipich's "failure to train" allegations do not alter the fact that Hammond had no constitutional obligation to rescue him, and that there was no evidence supporting the existence of such a duty on the basis of a special relationship. Even if there were, Cipich's "failure to train" allegations would fail. To establish a municipality's liability on this basis, a plaintiff must show (1) that a municipality or its official policymaker knows to a moral certainty

that municipal employees will confront a particular situation, (2) that the situation either presents the employee with a difficult choice that training will make easier or that there is a history of employees mishandling similar situations, and (3) that the incorrect decision or action by the employee will frequently cause the deprivation of a citizen's constitutional rights. *Id.* 297–98. Cipich claims that if Hammond had properly trained its personnel in water rescue operations, the firefighters on the scene would have entered the water much sooner and would have conducted a generally more coordinated rescue effort. As noted above, however, a municipality has no constitutional obligation to rescue those in danger, or even to provide emergency rescue services at all, and cannot be liable for the failure to rescue or for damages resulting from botched rescues. Thus, poorly performed rescues by poorly trained rescuers would not cause the deprivation of a citizen's constitutional rights, and Hammond could not have been liable under a "failure to train" theory.

recognized as an exception." *Id.* at 119. We concluded that adequate fire protection was so similar to adequate police protection that a government entity should be equally immune from tort liability for the failure to provide such services. *Id.* We particularly noted that both police and fire protection services are essential for public safety, the preservation of which is the government's primary function. *Id.* Although our application of the *Benton* decision established new precedent, we were careful to note that our decision was entirely consistent with the long recognized common law rule that a municipality is immune from liability for damages resulting from the failure to provide suitable firefighting equipment or an adequate supply of water, and for the negligent failure to provide, in a timely manner, an adequate number of firefighters competent and fit to fight a fire. *Id.* (citing *Boyle v. Anderson Fire Fighters Ass'n Local 1262,* 497 N.E.2d 1073, 1077 (Ind.Ct.App.1986) (citing *Larimore v. Indianapolis Water Co.,* 197 Ind. 457, 151 N.E. 333 (1926); *Trustees v. New Albany Waterworks,* 193 Ind. 368, 140 N.E. 540 (1923); *Robinson v. City of Evansville,* 87 Ind. 334 (1882))).

Our inquiry is the same here. To determine whether Hammond was entitled to immunity from tort liability for damages arising out of its efforts to rescue Cipich, we must ask whether Hammond's provision of such emergency rescue services through its fire and police departments is so closely akin to one of the limited exceptions (the provision of adequate protection from crime and fire, the appointment of competent officials, or the making of correct judicial decisions) that it should be treated as one as well. A municipality's provision of emergency rescue services is clearly like the provision of police and fire protection in that all of these are necessary for the safety and well-being of citizens, which, as we recognized in *Gates,* is the primary function of government. And in many cases, the provision of emergency rescue services are not just similar to the provision of police and fire protection, but are an inextricable component of such services. Further, as with the case of fire protection services in *Gates,* the immunization from liability of a municipality for damages resulting from emergency rescue operations is entirely consistent with the long-standing common law rule that a municipality cannot be liable for the negligent failure to provide, in a timely manner, an adequate number of firefighters competent and fit to fight a fire.

In sum, we conclude that under the common law as set out in *Benton* and *Gates,* the failure to provide adequate rescue services necessary to aid those in emergency situations is so akin to the failure to provide adequate police protection to prevent crime and the failure to provide adequate fire protection to prevent fire damage that government entities should be equally immunized from tort liability for claims relating to the failure to provide adequate emergency rescue services. Thus, Hammond is immune from Cipich's claims that it negligently failed to provide sufficient emergency rescue services under the circumstances. Hammond was therefore entitled to judgment on the evidence on Cipich's negligence claims.

Reversed.

DARDEN, J., concurs.

BARNES, J., concurs in result.